**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RODNEY CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-00132 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Rodney Clemons, an inmate in the custody of the Illinois Department of Corrections, began experiencing pain in his right foot and surgically repaired right ankle while incarcerated at Stateville Correctional Center ("Stateville"). He claims that the treatment he received from Stateville's medical staff, including its former Medical Director, Dr. Saleh Obaisi, failed to address his pain sufficiently. Consequently, Clemons filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that Dr. Obaisi, Dr. Arthur Funk, and Wexford Health Sources, Inc. ("Wexford") were deliberately indifferent to his serious medical condition in violation of his Eighth Amendment rights. Ghaliah Obaisi, in her role as the independent executor of Dr. Obaisi's estate, Dr. Funk, and Wexford (collectively, Defendants) have now moved for summary judgment. (Dkt. No. 151.) For the reasons that follow, their motion is granted.

**BACKGROUND**

**I.      Local Rule 56.1**

Before summarizing the material facts, the Court first addresses Defendants' contention that Clemons's statement of additional facts in opposition to Defendants' motion for summary judgment fails to comply with Northern District of Illinois Local Rule 56.1. That rule requires a

party moving for summary judgment to submit a statement of material facts that it contends entitle it to summary judgment. L.R. 56.1(a)(2), 56.1(d). The statement of facts "must consist of concise numbered paragraphs" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material . . . that supports it." L.R. 56.1(d)(1), (2). The party opposing summary judgment must then file a response to the movant's statement. L.R. 56.1(b)(2). The response should respond to each numbered paragraph in the moving party's statement and, where the opposing party disputes a fact, it must include specific references to the affidavits, parts of the record, or other supporting materials relied on to controvert that fact. L.R. 56.1(e). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3). To the extent the opposing party wishes to present any additional facts, it may do so by submitting a separate statement of additional facts that complies with Local Rule 56.1(d), which also governs the moving party's statement of material facts. L.R. 56.1(b)(3). Then, the moving party must submit a response to those additional facts subject to the requirements for the opposing party's response to the statement of material facts set forth in Local Rule 56.1(e). L.R. 56.1(c)(2).

According to Defendants, Clemons runs afoul of Local Rule 56.1 by submitting an exhibit to his statement of additional facts consisting of medical records and performance reviews that includes nearly 40 pages not cited in the statement of facts. Defendants ask the Court to strike those pages. Local Rule 56.1, however, provides only that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it" and that "[a]ll evidentiary material identified in [the submission] must be included as numbered exhibits within the statements of fact." L.R. 56.1(d)(3), (4). There is no language in Local Rule 56.1 suggesting that a party must submit as exhibits only the specific

pages of evidentiary material cited in a statement of facts, even when those pages appear within a larger document or record. And in any case, the inclusion of the additional material here did not hinder the Court's ability to review effectively the evidence supporting summary judgment or otherwise constitute an abuse of the summary judgment procedures.

Defendants also fault Clemons for sometimes citing directly to the record in his brief, as opposed to the factual assertions in his statement of additional facts. That is, in fact, a Local Rule 56.1 violation. *See* L.R. 56.1(g). But, for the most part, even when Clemons's brief cites directly to the record, he pairs the record citation with a citation to either his or Defendants' Local Rule 56.1 submission. Even in the isolated instances where Clemons's brief includes an unadorned citation to the record, the citations support factual assertions consistent with those in the parties' respective Local Rule 56.1 submissions. Thus, Clemons's non-compliance did not prevent Defendants from responding to the asserted fact or otherwise create any confusion as to the existence of a material factual dispute. *See FirstMerit Bank, N.A. v. 2200 N. Ashland, LLC*, No. 15 C 572, 2014 WL 6065817, at *5 (N.D. Ill. Nov. 13, 2014) ("[The Court] should be able to go to [the plaintiff's] Local Rule 56.1 statement of facts and Defendants' responses to that statement to determine whether the relevant facts are contested or uncontested.").

By contrast, Defendants' response to Clemons's statement of additional facts unnecessarily muddies the inquiry as to the existence of undisputed material facts. In particular, Defendants frequently resist admitting facts by adopting a hyper-technical approach to responding to Clemons's factual assertions. For example, Clemons asserts that a nurse noted that he had received approval "to see a podiatrist." (Defs.' Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 12, Dkt. No. 170.) In response, Defendants admit the assertion in part but "dispute that the nurse noted that Plaintiff had approval to see a podiatrist" because the "note

states 'foot doctor' not podiatrist." (*Id.*) While it is true that the cited medical record uses the term "foot doctor," Clemons did not purport to quote directly from the record and a podiatrist is a foot doctor. Thus, Defendants' dispute is not genuine. And even if the nurse was referring to some other type of doctor specializing in feet, the distinction is not material to any issue presently before the Court. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("It is the litigants' duty to clearly identify ***material*** facts in dispute . . . ." (emphasis added)).

At other times, Defendants denials are evasive and misleading. In one instance, Clemons asserts that he "was seen by a nurse who noted that he or she discussed Mr. Clemons's case with Dr. Obaisi who relayed that the June 30, 2016 shoe request was denied by Wexford." (DRPSAF ¶ 11.) Defendants' response disputes the assertion in part by stating that "[t]he nursing note indicates that Plaintiff received a [sic] order for gym shoes on June 14, 2016 and per medical supply, the supplier is awaiting further information from the provider. The nurse then told Plaintiff that the nurse would follow-up with the Medical Director and that Plaintiff understood this." (*Id.*) Defendants accurately recount the nurse's note of her interaction with Clemons during the appointment. But the record contains an additional entry from later on the same day showing that the nurse discussed the case with the Medical Director, *i.e.* Dr. Obaisi, and he told her that the request for gym shoes was denied. (Pl.'s Statement of Additional Facts, Ex. A at Clemons_000120, Dkt. No. 164.)

Defendants' improper denials "defeat the whole point of Local Rule [56.1]—to identify just what facts are actually in dispute." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). The Court is not "required to wade through improper denials . . . in search of a genuinely disputed fact." *Id.* at 529. Where Defendants fail to dispute one of Clemons's factual

assertions clearly and concisely in a way that accurately reflects the record and identifies a genuine issue of fact, the Court will deem Clemons's facts as admitted.

## II. Factual Background

Subject to the above considerations, the facts summarized below are undisputed.

Clemons has been incarcerated at Stateville since 2005. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDSF") ¶ 2, Dkt. No. 161.) Years before beginning his term of incarceration, Clemons sustained an injury to his right ankle that required surgery. (*Id.* ¶ 11.) As a result of the surgery, Clemons has a steel plate and six screws installed in his ankle. (*Id.*) While housed at Stateville, Clemons began experiencing pain in his right foot and ankle as a result of wearing shoes that did not fit him properly. (DRPSAF ¶ 2.) Despite trying a variety of different options, none of the shoes available at the commissary helped alleviate Clemons's right-foot pain. (*Id.*)

On October 29, 2012, Clemons had an appointment with Dr. Obaisi, Stateville's then-Medical Director, for issues related to his surgically repaired right ankle. (PRDSF ¶¶ 4, 12.) After the visit, Dr. Obaisi ordered size 11 wide gyms shoes for Clemons, and Wexford's utilization management department subsequently approved Dr. Obaisi's request. (PRDSF ¶ 12; DRPSAF ¶ 3.)

About a month later, Clemons visited Dr. Obaisi complaining of pain in his right ankle. (PRDSF ¶ 13.) In response, Dr. Obaisi changed Clemons's pain medication. (*Id.*) In March 2013, Dr. Obaisi issued Clemons a special-needs permit for a low bunk, medical shoes, and an ankle brace. (*Id.* ¶ 14.) After Clemons came to Dr. Obaisi on November 4, 2013 complaining that his shoes were worn out, Dr. Obaisi again ordered Clemons special shoes—specifically, size 11

wide, high-top gym shoes. (PRDSF ¶ 15; DRPSAF ¶ 6.) Clemons received the shoes a month later. (*Id.*)[1]

Clemons returned to Dr. Obaisi with complaints of right foot and ankle pain on August 19, 2014. (PRDSF ¶ 16.) As a result of the visit, Dr. Obaisi changed Clemons's medication and again ordered special shoes for him. (*Id.*) A month later, Clemons's permits for a low bunk, medical shoes, and an ankle brace were renewed. (*Id.* ¶ 17.) During an October 6, 2014 consultation, Clemons told Dr. Obaisi that the special shoes had helped in the past, leading Dr. Obaisi to order a new pair of wide shoes for Clemons. (*Id.* ¶ 18.) Wexford approved the order, and Clemons received the shoes on November 12, 2014. (*Id.*) The following year, on September 1, 2015, Dr. Obaisi again ordered special wide shoes for Clemons and renewed his permits for a low bunk, medical shoes, and an ankle brace. (*Id.* ¶ 20.) Yet this time, Wexford did not approve the request. (PRDSF ¶ 20; DRPSAF ¶ 8.) Instead, Clemons was provided with gel insoles that proved ineffective at alleviating his pain. (PRDSF ¶ 20; DRPSAF ¶¶ 8–9.)

When Clemons visited a nurse on June 4, 2016, he asked about receiving new shoes. (DRPSAF ¶ 9.) Specifically, Clemons explained to the nurse that he had been receiving special shoes for the past few years but recently stopped receiving them and instead had been provided with gel insoles that did not work. (*Id.*) The nurse noted that Clemons was upset about "pay[ing] repeatedly for the same issue and not getting results." (*Id.*) Four days later, Clemons had an appointment with a physician assistant, who noted that Clemons was continuing to experience

---

[1] Clemons states that Wexford only approved him to receive off-the-shelf shoes rather than the wide shoes requested by Dr. Obaisi, citing an approval request form. (DRPSAF ¶ 6.) That form shows that there was a request for "high top gym shoe 11E (New Balance)" and that Wexford "[a]pproved one pair of of [sic] gym shoes off the shelf. Does not have to be new balance." (Pl.'s Statement of Additional Facts, Ex. A at Clemons_000507.) But there does not appear to be any support for Clemons's assertion that the shoes he received were not wide. Moreover, Clemons does not dispute that he received some form of "special shoes" following the November 4, 2013 appointment. (PRDSF ¶ 15.)

pain in his right ankle. (*Id.* ¶ 10.) The physician assistant further noted that Clemons had previously received shoes that were "perfect," that commissary shoes did not provide relief for his pain, and that insoles did not work. (*Id.*) In addition, the physician assistant noted that Dr. Obaisi's request for shoes had been denied but that Dr. Obaisi intended to resubmit the request. (*Id.*) Shortly thereafter, on June 14, 2016, Clemons visited Dr. Obaisi, complaining that his shoes were worn out. (PRDSF ¶ 22.) Dr. Obaisi subsequently ordered replacement shoes for Clemons. (PRDSF ¶ 22; DRPSAF ¶ 11.) Yet a nurse who saw Clemons in July 2016 noted that they had spoken with Dr. Obaisi, who informed them that Wexford had denied Dr. Obaisi's shoe request. (DRPSAF ¶ 11.)

In September 2016, Clemons visited a nurse who noted that Clemons had been approved by the Illinois Department of Corrections to see a podiatrist and receive new gym shoes. (*Id.* ¶ 12.) Later that month, a nurse practitioner observed that Clemons had filed a grievance regarding his need for accommodating shoes and an appointment with a podiatrist. (*Id.* ¶ 13.) Clemons next met with Dr. Obaisi on March 1, 2017. (PRDSF ¶ 24.) During that visit, Dr. Obaisi took x-rays of Clemons's right foot and ankle. (*Id.*) After reviewing the x-rays two weeks later, Dr. Obaisi requested a referral for Clemons to see an outside podiatrist. (*Id.*) Wexford approved the referral request. (*Id.*) Clemons had his appointment with an outside podiatrist on November 22, 2017. (*Id.* ¶ 26.) During the visit, Clemons informed the podiatrist that an ankle brace was not effective at providing him relief. (*Id.*) As a result, the podiatrist recommended accommodative inserts and "a gym shoe type orthopedic." (*Id.*) The podiatrist also recommended that Clemons return for a follow-up visit in three months. (*Id.*)

Shortly after seeing the podiatrist, Clemons had an appointment with Dr. Obaisi. (*Id.* ¶ 27.) Dr. Obaisi noted the podiatrist's recommendations and instructed that Clemons be

provided with insoles in two weeks. (*Id.*) Dr. Obaisi further requested that Clemons be approved for a follow-up appointment, and Wexford subsequently approved the request. (*Id.*) That was the last time Clemons saw Dr. Obaisi, as the doctor passed away near the end of December 2017. (*Id.* ¶ 4.)

Clemons next saw the outside podiatrist on July 25, 2018. (DRPSAF ¶ 18.) The podiatrist observed that Clemons was experiencing post-traumatic arthritis, skin maceration, and hammer toes in his right foot. (*Id.*) In addition, the podiatrist recommended that Clemons be scheduled for a scan of his right foot for accommodative orthoses and that Clemons be given the wide gym shoes that he had been provided in the past. (*Id.*) Wexford, however, subsequently decided to adopt a different treatment plan for Clemons than the one recommended by the outside podiatrist. (*Id.* ¶ 19.) Instead, Wexford determined that Clemons would be treated on site in lieu of a follow-up appointment with the outside podiatrist and that Clemons would be provided with "off-shelf wide shoes from commissary or central supply" instead of ordering supportive shoes through the outside provider. (DRPSAF ¶¶ 19–20; Pl.'s Statement of Additional Facts, Ex. A at Wexford 000133.)

On November 2, 2018, Clemons visited with Dr. Obaisi's successor as Stateville's Medical Director, Dr. Marlene Henze, who observed interdigital maceration in Clemons's right foot and directed treatment with a daily application of Betadine. (DRPSAF ¶ 21.) Dr. Henze ordered Clemons orthotics and scheduled him for a follow-up with an outside podiatrist. (*Id.*) But again, Wexford denied the request for Clemons to receive special shoes and a follow-up podiatry appointment. (*Id.* ¶ 22.) Instead, Wexford decided that follow-up would occur on site in one or two months, and if the maceration had not healed, a follow-up with an outside podiatrist would be requested. (*Id.*) When Clemons returned for an evaluation with Dr. Henze on January 3, 2019,

Dr. Henze observed the persistence of maceration between his right toes and noted that Clemons continued to experience pain in the area. (*Id.* ¶ 23.) In addition, Dr. Henze observed that Clemons's current shoes were too narrow and were contributing to the maceration between his toes. (*Id.*) As a result, she requested that Clemons be seen by an outside podiatrist and be provided with custom orthotics. (*Id.*) However, Wexford denied Dr. Henze's request for an outside podiatrist appointment and directed that Clemons be admitted to Stateville's infirmary for two weeks for direct observation of Betadine application. (*Id.* ¶ 24.)

Wexford denied another request for Clemons to visit with an outside podiatrist on March 12, 2019. (*Id.* ¶ 25.) Wexford asked for photographs of Clemons's right foot for its review, and after receiving the requested photographs, it decided against allowing Clemons to see an outside podiatrist. (*Id.* ¶¶ 25–27.) On April 7, 2019, Clemons visited Dr. Henze expressing concern over his right foot and seeking to schedule a visit with a podiatrist. (*Id.* ¶ 28.) During the visit, Dr. Henze observed that Clemons's right foot "condition has underlined worsened!" (*Id.* ¶ 28(d).) She further determined that Clemons would likely need corrective surgery of a hallux valgus deformity on his right foot. (*Id.* ¶ 28(j).) Finally, she indicated that she intended to request again that Clemons be evaluated by a podiatrist. (*Id.* ¶ 28(k).) This time, Wexford approved Clemons to visit an outside podiatrist. (*Id.* ¶ 29.) Moreover, on July 11, 2019, Wexford approved Clemons for a consultation for custom shoes and functional inserts. (PRDSF ¶ 30; DRPSAF ¶ 30.) Clemons received the custom shoes on August 21, 2019. (DRPSAF ¶ 30.) Finally, on January 22, 2020, Clemons successfully underwent surgery on his right foot to remove a bunion and correct his hammertoes. (PRDSF ¶ 31.)

To sum up, according to Clemons, he had been diagnosed clinical abnormalities in his right foot beginning at least in November 2012. (DRPSAF ¶ 33.) Yet, between 2012 and 2019,

he was largely denied footwear that accommodated his right-foot abnormalities, thereby worsening those abnormalities and causing him pain. (*Id.* ¶ 34.) As a result, Clemons brought the present lawsuit, alleging that Dr. Obaisi, Wexford, and Wexford's Regional Medical Director for Illinois, Defendant Dr. Arthur Funk, were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the U.S. Constitution.

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Courts may consider the "'materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials'" in deciding a motion for summary judgment. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).

### I.     Dr. Obaisi

The Court begins with the claims against Clemons's primary treating physician: Dr. Obaisi.

An Eighth Amendment deliberate indifference claim requires a plaintiff to establish that he suffered from "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (internal quotation marks omitted). The first, objective, element of a deliberate indifference claim requires in the medical context that "the inmate's medical need be sufficiently serious." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). The second,

subjective, element requires the plaintiff to prove that the "prison official acted with a sufficiently culpable state of mind. A negligent or inadvertent failure to provide adequate medical care is insufficient to state a [§] 1983 claim." *Id.* For purposes of summary judgment, Defendants do not dispute that Clemons's right-foot pain constituted a serious medical condition; however, they deny that Dr. Obaisi was deliberately indifferent to that condition. For his part, Clemons contends that Dr. Obaisi exhibited deliberate indifference by delaying a referral for Clemons to see an outside podiatrist because of cost concerns and by failing to ensure that he received shoes that sufficiently accommodated his right-foot abnormalities.

For a prison official to be deliberately indifferent, he "must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662. "While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). Instead, a medical professional is liable only where he makes "a decision that represents such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted). Thus, "where evidence exists that the defendant[] knew better than to make the medical decisions that [he] did," the claim should go to a jury. *Petties*, 836 F.3d at 731. By contrast, "a mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1991) (internal quotation marks omitted).

In considering whether a defendant has been deliberately indifferent, a court must look to "the totality of an inmate's medical care." *Petties*, 836 F.3d at 728. Deliberate indifference does not require a plaintiff to show "that he was literally ignored" by medical staff. *Id.* at 729. Rather, a prison doctor's "departure from minimally competent medical judgment" may be shown where the doctor "persists in a course of treatment known to be ineffective" or "chooses an easier and less efficacious treatment without exercising professional judgment." *Id.* at 729–30 (internal quotation marks omitted). Moreover, prison doctors may be liable for deliberate indifference only where "the doctors personally caused a violation of [the plaintiff's] constitutional rights." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 242 (7th Cir. 2021).

## A.  Post-Deposition Affidavit

Before proceeding, the Court first addresses Defendants' objection to evidence Clemons submitted to show that Dr. Obaisi made decisions based on cost concerns rather than medical judgment. In particular, Clemons has submitted his own affidavit in which he states that Dr. Obaisi told Clemons that he believed that Clemons needed to be referred to a specialist but delayed making such a referral out of cost concerns. (Pl.'s Statement of Additional Facts, Ex. C ¶¶ 5–10, Dkt. No. 162-3.) The affidavit further states that when Clemons asked why he was not receiving his special wide shoes, Dr. Obaisi "responded that requests for special shoes had been denied due to cost considerations." (*Id.* ¶ 11.) Defendants ask the Court to strike Clemons's affidavit, as it contains statements that were not disclosed in discovery and were not mentioned during Clemons's deposition.

In seeking to strike Clemons's affidavit, Defendants invoke *Scott v. Harris*, 550 U.S. 372, 380 (2007), where the Supreme Court explained that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

believe it, a court should not adopt that version of the facts for purposes of a ruling on a motion for summary judgment." Here, however, the Court understands Defendants to contend that Clemons's statements in his affidavit contradict his own prior deposition testimony. Thus, the challenge to Clemons's affidavit is better characterized as arising under the "sham-affidavit rule," which "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). The purpose of the rule is to prevent parties from "creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). The sham-affidavit rule must be applied "with great care" and "an affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571–72 (7th Cir. 2015) (internal quotation marks omitted).

Defendants fail to demonstrate any contradiction between Clemons's post-deposition affidavit and his deposition testimony that would warrant striking the affidavit in whole or in part. Indeed, Defendants do not claim that Clemons ever denied that Dr. Obaisi made statements concerning cost-cutting measures. Rather, Defendants can only show that Clemons failed to mention those statements when asked questions at his deposition that Defendants themselves concede were open-ended. Further, the Court notes that Clemons's affidavit serves to build on statements Clemons made during his deposition. For example, Clemons testified at his deposition that Dr. Obaisi, at times, told him that "there's nothing they could do for [Clemons] without getting it approved, and I would come back and he would say they didn't approve it." (Defs.' Statement of Facts, Ex. A at 38:10–16, Dkt. No. 152-1.) Clemons also testified that Dr. Obaisi expressly told him that he needed to see a podiatrist but failed to ensure that such an appointment

was promptly scheduled. (*Id.* at 39:14–40:13.) Such testimony suggests that Clemons's affidavit is relatively consistent with his prior deposition testimony and simply fills in a gap in that testimony regarding Dr. Obaisi's treatment choices by explaining that there was a cost motivation at play. For that reason, the Court rejects Defendants' request to strike any of the statements in Clemons's affidavit.

### B. Delay in Referring Clemons to a Podiatrist

Clemons asserts that Dr. Obaisi violated his Eighth Amendment rights by recognizing that Clemons needed to see an outside podiatrist but failing to make a referral due to cost concerns. "Although administrative convenience and cost may be, in appropriate circumstances, ***permissible factors*** for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered ***to the exclusion of reasonable medical judgment*** about inmate health." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011).

To show that Dr. Obaisi prioritized cost considerations over reasonable medical judgment, Clemons notes that, under Wexford's contract with the State of Illinois, Wexford is permitted to make up to 216 inpatient and 2,160 outpatient referrals per year, and when those limits are exceeded, Wexford's compensation from the State is subject to adjustment. (DRPSAF ¶ 1.) Then, in his affidavit, Clemons states that Dr. Obaisi expressly told him that he agreed that Clemons needed to see a podiatrist but, on multiple occasions, declined to make the referral because Dr. Obaisi was at or approaching his limit for referrals to outside specialists. (*Id.* ¶ 4.) Finally, Clemons points to Wexford's 2014–15 and 2015–16 performance reviews of Dr. Obaisi, in which he was rated as not meeting expectations for "cost-effectiveness" and "financial responsibility." (*Id.* ¶¶ 31–32.) Specifically, Wexford observed that Dr. Obaisi was overbudget for offsite care. (*Id.*)

Yet the performance reviews criticizing Dr. Obaisi for being overbudget with respect to outpatient referrals provide little support for Clemons's contention that Dr. Obaisi delayed referring Clemons to a podiatrist out of cost concerns. On the contrary, the earliest performance review covers 2014–15 and essentially finds that Dr. Obaisi made too many referrals. It might reasonably be inferred that Dr. Obaisi may have prioritized cost concerns following those performance reviews. But Clemons states that Dr. Obaisi first cited the referral limit as a basis for declining Clemons's request for a podiatrist appointment in 2012. If anything, later performance reviews claiming that Dr. Obaisi made too many outside referrals support an inference that Dr. Obaisi had a record of not prioritizing cost concerns prior to those reviews. For purposes of summary judgment, the Court finds that the performance reviews do not support a plausible inference of a cost-cutting motivation on the part of Dr. Obaisi, at least prior to the date of the reviews.

Because the Court has found that Clemons's affidavit is admissible, the Court accepts at this stage that Dr. Obaisi told Clemons that he was delaying a podiatrist referral due to cost concerns. But, as discussed above, cost considerations are not an impermissible consideration in making treatment decisions so long as they do not override the doctor's reasonable medical judgment. Moreover, while Clemons may have benefited from an immediate referral to an outside podiatrist, "an inmate is not entitled to demand specific care and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (internal quotation marks and citation omitted); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient."). The Court must "defer to medical professionals' treatment decisions unless there is evidence that

no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (internal quotation marks omitted).

Here, the undisputed facts demonstrate that, prior to 2017, Dr. Obaisi pursued an reasonably effective alternative approach to managing Clemons's foot pain by prescribing special wide shoes and pain medication. Indeed, Clemons himself conceded that when he received the proper shoes, they worked "perfect[ly]" in relieving his pain. (DRPSAF ¶ 10.) And Dr. Obaisi consistently requested that Clemons be provided with the wide shoes that worked best for his pain, while also ensuring that Clemons received permits for special shoes and a low bunk, as well as prescribing pain medication. (PRDSF ¶¶ 12–20.) Notably, when Clemons did finally have his first appointment with an outside podiatrist in 2017, the podiatrist recommended a similar course of treatment consisting of wide shoes and accommodative inserts. (PRDSF ¶¶ 26–27; DRPSAF ¶ 18.) At least during the time when Dr. Obaisi was treating Clemons (*i.e.*, between 2012 and his death in December 2017), there is no evidence that any medical professional believed that Clemons needed something more than accommodating shoes. Given the undisputed evidence of Dr. Obaisi and the specialists' diagnostic alignment, no reasonable jury could conclude that Dr. Obaisi was deliberately indifferent in failing to refer Clemons to a podiatrist earlier than he did.

### C. Failure to Ensure Clemons Received Appropriate Shoes

Although Dr. Obaisi was not deliberately indifferent in treating Clemons's foot pain by requesting he be provided with special wide shoes, Clemons is quick to point out that he was not provided with the proper shoes for several years. In particular, the record indicates that, after Clemons had worn out his existing pair of shoes in September 2015, Wexford refused to approve Dr. Obaisi's request for a replacement pair. And Clemons claims that Dr. Obaisi exhibited

deliberate indifference in failing to ensure that Clemons received appropriate footwear from Wexford.

Beginning in October 2012, Dr. Obaisi regularly placed orders for special wide shoes for Clemons, which Wexford approved until Dr. Obaisi requested a replacement pair in September 2015. Despite Wexford rejecting his requests, Dr. Obaisi continued to resubmit orders for the special wide shoes that best relieved Clemons's pain until the treating relationship ended on account of Dr. Obaisi's death in December 2017. (PRDSF ¶¶ 12–22; DRPSAF ¶¶ 6, 8–10.) At certain (unspecified) times, Clemons claims that Dr. Obaisi told him that Wexford was refusing to fill orders for his preferred shoes due to cost considerations. (DRPSAF ¶ 5.) Nonetheless, there is no evidence that Dr. Obaisi modified his orders to conform to Wexford's preferred, less-effective options.

Taken together, the undisputed evidence shows that Dr. Obaisi determined that Clemons should be provided with the appropriate wide shoes but that, beginning in September 2015, Wexford decided to override Dr. Obaisi and pursue a different course of treatment. Even though the decision to provide Clemons with less effective shoes was Wexford's decision, Clemons asserts that Dr. Obaisi should have appealed Wexford's decision or taken some other action to ensure that Clemons received the shoes that Dr. Obaisi had determined, in his medical judgment, to be the most suitable for Clemons's condition. But Clemons comes forward with no evidence suggesting that Dr. Obaisi had any control over Wexford's decision or otherwise could have reversed it. *See Dean*, 18 F.4th at 244 ("No evidence supports the inference that [the defendant] could have changed the course of [the plaintiff's] treatment if she had been more persistent."). Instead, Clemons speculatively asserts that Dr. Obaisi could have done something. Dr. Obaisi, of course, did continue to resubmit requests for Clemons's preferred shoes. And in any case,

Clemons "cannot establish deliberate indifference simply by citing to things that [Dr. Obaisi] did not do. Without any evidence of his mental state, [Dr. Obaisi's] inaction demonstrates, at most, negligence." *Id.* at 243; *see also Young v. Wexford Health Sources, Inc.*, No. 18-CV-4224, 2022 WL 2286776, at *8 (C.D. Ill. May 27, 2022) ("Plaintiff also presents no evidence that Defendant . . . was required to appeal Wexford's denial of [the recommended treatment], or that his decision not to appeal the denial was not based in professional judgment or blatantly inappropriate.").

In sum, the undisputed evidence establishes that Dr. Obaisi attempted to provide Clemons with the wide shoes that best helped his right-foot pain. Although Clemons was deprived of appropriate shoes for several years, that was because Wexford refused to approve multiple of Dr. Obaisi's requests for them. And because Clemons presents no evidence suggesting that Dr. Obaisi was involved in or had control over Wexford's decision to stop providing Clemons with his special wide shoes, Clemons fails to demonstrate an issue of fact as to whether Dr. Obaisi was deliberately indifferent in failing to challenge Wexford's decision. Given the absence of factual issues as to any aspect of Dr. Obaisi's treatment of Clemons's right foot, the Court grants summary judgment in favor of Ghaliah Obaisi.

## II.     Dr. Funk

Next, Clemons seeks to hold Dr. Funk, Wexford's Regional Medical Director, responsible for deliberate indifference. While Clemons concedes that he was never treated by Dr. Funk and does not recall ever meeting him in person, Clemons nonetheless argues that Dr. Funk's deliberate indifference is evidenced by his failure to respond to Clemons's letters

18

complaining of pain from being deprived of appropriate footwear and requesting a podiatry referral. (PRDSF ¶¶ 28–29; DRPSAF ¶ 7.)

To hold an individual defendant liable under § 1983, a plaintiff must prove that the defendant "caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Thus, a supervising prison official like Dr. Funk "cannot be personally liable under a theory of respondeat superior." *Id.* at 992–93 (internal quotation marks omitted). Rather, "some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Id.* at 993 (internal quotation marks omitted). Where an official did not directly participate in treating a plaintiff, such a connection can be shown where the official nonetheless "condoned or acquiesced in a subordinate's unconstitutional treatment." *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010).

The Seventh Circuit has made clear that there is no "ironclad rule that any prisoner communication to a prison official anywhere in the corrections hierarchy constitutes adequate notice to the official of a violation of the Eighth Amendment." *Vance*, 97 F.3d at 993. It is the plaintiff's burden to "demonstrate[e] that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Clemons falls well short of meeting that burden here. He only vaguely asserts that he sent at least two letters to Dr. Funk detailing his issues and that he sent those letters according to the process by which Stateville prisoners send mail. (DRPSAF ¶ 7.) But Clemons admits that he does not know if Dr. Funk received any of his letters (PRDSF ¶ 29), and there is no copy of any letter from Clemons in the record nor is there any other evidence suggesting that Dr. Funk ever received any such letters. *See, e.g.*, *Yerks v. McArdle*, No. 19-cv-595-wmc, 2022 WL 741883, at *7 (W.D.

19

Wis. Mar. 11, 2022) ("[P]laintiff's claim that he sent the letter to [the defendant] does not by itself create a genuine dispute of material fact regarding her subjective awareness of its contents."); *Johnson v. Carter*, No. 12-cv-05712, 2017 WL 4122714, at *4 (N.D. Ill. Sept. 18, 2017) ("Nothing in the record shows that Defendant . . . read or even received the letters . . . . As such, the letters alone would be insufficient to prove deliberate indifference."). Thus, the record cannot support a reasonable inference that Dr. Funk ever received notice of Clemons's concerns about the treatment of his right-foot pain. Consequently, Clemons's deliberate indifference claim against Dr. Funk fails as a matter of law and Dr. Funk is entitled to summary judgment.

### III. Wexford

Finally, Clemons asserts a deliberate indifference claim against Wexford, claiming that its cost-cutting measures prevented Clemons from receiving shoes that accommodated his right-foot abnormalities and a timely podiatry referral. To prevail on his deliberate indifference claim against Wexford, Clemons must establish Wexford's liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The Supreme Court held in *Monell* that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Wexford, however, is a private corporation, not a municipality. Nonetheless, the Seventh Circuit held in *Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982), that "just as a municipal corporation is not vicariously liable upon a theory of *respondeat superior* for the constitutional torts of its employees, a private corporation is not vicariously liable under [§] 1983 for its employees' deprivations of others' civil rights." *Id.* at 128 (citation omitted). While the Seventh Circuit at times has suggested that the now long-established rule should be revisited, "[f]or now, this circuit's case law still extends *Monell* from municipalities to private corporations." *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 795–96 (7th

Cir. 2014); *see also Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021)

("Circuit precedent establishes at this time that private corporations acting under color of law

also benefit from *Monell*'s rejection of respondeat superior liability for an employee's

constitutional violations.").

     Under *Monell*, Wexford may be held liable only if its employee causes an injury in the

"execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.

Municipal liability under § 1983 may be established:

> (1) through an express policy that, when enforced, causes a constitutional
> deprivation; (2) through a wide-spread practice that although not authorized by
> written law and express policy, is so permanent and well-settled as to constitute a
> custom or usage with the force of law; or (3) through an allegation that the
> constitutional injury was caused by a person with final policymaking authority.

*Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (internal quotation marks omitted).

Further, "the plaintiff must show that the municipal action was the moving force behind the

federal-rights violation," which "requires a direct causal link between the challenged municipal

action and the violation of the plaintiff's constitutional rights." *Dean*, 18 F.4th 235 (internal

quotation marks omitted). Finally, the challenged policy, practice, or final policymaker's

decision must reflect Wexford's deliberate indifference to an excessive risk to inmate health or

safety. *Sterling v. Wexford Health Sources, Inc.*, No. 16 C 6280, 2021 WL 5906067, at *9 (N.D.

Ill. Dec. 13, 2021).

     A *Monell* claim, of course, requires a plaintiff to show some violation of his

constitutional rights. Yet the Court has already determined that neither Dr. Obaisi nor Dr. Funk

were deliberately indifferent. "Often the lack of liability on the part of the subordinate actors

means that there is nothing unlawful for which the entity might be liable, but that is not always

the case." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021). Institutional

liability remains available where "the institutional policies are themselves deliberately indifferent

to the quality of care provided." *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 378 (7th Cir.

2017). One way of making such a showing is "by demonstrating that pervasive systemic

deficiencies were the moving force behind an injury." *Quinn*, 8 F.4th at 568 (internal quotation

marks omitted). And here, Clemons's evidence suggests that Wexford's prioritization of costs

was the moving force that precluded him from receiving adequate treatment for his right-foot

pain.

According to Clemons, Wexford had a widespread practice or custom elevating cost-

cutting concerns over inmate's medical needs. As a result of this unwritten policy, Clemons was

denied accommodating footwear and a referral to an outside podiatrist, thereby unnecessarily

prolonging and worsening his right-foot pain. As evidence of that unwritten policy, Clemons first

points to the provisions in Wexford's contract with Illinois limiting referrals. But those referral

limits, by themselves, "do not constitute an express 'cost-cutting policy' as they do not dictate

how Wexford should make treatment decisions (with respect to costs or otherwise)." *Sterling*,

2021 WL 5906067, at *10. To show that Wexford made treatment decisions based on costs,

Clemons relies on Dr. Obaisi's statements citing cost considerations as limiting his ability to

provide Clemons with necessary treatment and Wexford's performance reviews faulting Dr.

Obaisi for being overbudget on offsite care. Such evidence does tend to reflect that cost

considerations played a role in Wexford's decisions regarding the treatment of Clemons's right

foot. Still, in applying *Monell*, "one key is to distinguish between the isolated wrongdoing of one

or a few rogue employees and other, more widespread practices." *Howell*, 987 F.3d at 645. That

requires "evidence that there is a true municipal or corporate policy at issue, not a random

event." *Id.* (internal quotation marks omitted). Put differently, "[t]o prove an official policy, custom, or practice within the meaning of *Monell*, [a plaintiff] must show more than the deficiencies specific to his own experience." *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016).

Commonly, the existence of a widespread practice or custom will be proved with evidence demonstrating that "the defendant government or company treated other, similarly situated patients in similar unconstitutional ways." *Howell*, 987 F.3d at 655. But here, Clemons comes forward with no evidence of Wexford's treatment of other inmates. It is possible for Clemons to create a genuine issue of fact regarding "systemic and gross deficiencies in Wexford's procedures or lack thereof" based on his own experiences but it is a "difficult task." *Quinn*, 8 F.4th at 568 (internal quotation marks omitted); *see also Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." (internal quotation marks omitted)). Specifically, in certain circumstances, "'repeated deliberate indifference toward the plaintiff' himself . . . may be adequate." *Thomas v. Chmell*, 569 F. Supp. 3d 732, 739 (N.D. Ill. 2021) (quoting *Howell*, 987 F.3d at 655).

Here, Clemons's evidence supports that Wexford declined to supply him the necessary wide shoes on multiple occasions between 2015 and 2019. In addition, even after Wexford approved Clemons to see an outside podiatrist in 2017, it delayed scheduling recommended follow-up appointments or decided that follow-up should occur on site instead. And there is evidence in the record suggesting that Wexford's actions were motivated, at least in part, by a desire to minimize costs. But Clemons has not adduced sufficient evidence to support a

conclusion that his experience "is reflective of a policy choice" by Wexford to cut costs by limiting inmate's access to necessary care. *Grieveson*, 538 F.3d at 774. At bottom, Clemons's experience concerns a single event—the mistreatment of his right-foot pain—even though the mistreatment was not the product of a single incident but multiple instances where Wexford decided either to deny Clemons the proper footwear or to delay referring him to a podiatrist, spread out over four-year period. Courts regularly find no widespread practice or custom in similar circumstances. *See, e.g.*, *Hildreth v. Butler*, 960 F.3d 420, 428 (7th Cir. 2020) (noting that, when presented only with evidence limited to the experience of a single plaintiff, numerous courts "have concluded that four or more incidents over varying periods—sometimes less than nineteen months—are insufficient to qualify as a widespread practice or custom"); *Grieveson*, 538 F.3d at 774 ("[Plaintiff's] evidence of four incidents that he alone experienced fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law." (internal quotation marks omitted)). Thus, the Court finds that a reasonable trier of fact could not infer systemic and gross deficiencies in Wexford's provision of medical care based solely on its pursuit of a cheaper, ineffective course of treatment as to a single inmate's single injury.

Because Clemons fails to present sufficient evidence from which a factfinder reasonably could infer a widespread practice or custom of elevating cost-cutting over effective medical treatment, Wexford cannot be held liable under *Monell*. For that reason, the Court grants Wexford summary judgment as to the § 1983 claim against it.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 151) is granted. The Clerk will enter Judgment in favor of Defendants.

ENTERED:

Dated:  March 27, 2023

_____
Andrea R. Wood
United States District Judge